[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 29, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10758
Non-Argument Calendar

_____

D. C. Docket No. 05-00013-CR-RWS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL E. JONES,
a.k.a. Wesley Williams,
a.k.a. Jacques Deloach,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 29, 2006)

Before TJOFLAT, DUBINA and WILSON, Circuit Judges.

PER CURIAM:

Michael E. Jones appeals his seventy-one month sentence following his negotiated guilty plea to one count of bank fraud, in violation of 18 U.S.C. §§ 1344(1) and 2. Upon a thorough review of the record on appeal, including the Fed. R. Crim. P. 11 plea hearing and sentencing transcripts, the presentence investigation report ("PSI"), and after consideration of the briefs of the parties to this Court, we find no reversible error.

BACKGROUND

Between May 1998 and April 2001, Jones engaged in a scheme to purchase numerous luxury vehicles and Rolex watches by creating and passing fraudulent certified checks to unsuspecting victims. In one instance, Jones used a fraudulent cashier's check in the amount of $45,500 to purchase a 1998 Range Rover from a private seller. Jones then sold the vehicle to Carmax for $28,851. In July 2001, Jones was arrested in Virginia after attempting to sell a Porsche Boxster, which he had fraudulently obtained, to an undercover officer. Jones was convicted and remained incarcerated until October 3, 2003.

On or about October 20, 2003, Jones commenced the instant check-kiting offense by opening a new checking account via the internet with Net Bank using a forged and non-sufficient-funds check. Jones then opened additional fraudulent accounts with other banks, after which he began kiting checks between the various

2

financial institutions. In August 2004, Jones again attempted to use a fraudulent certified check to purchase a 1991 BMW. Shortly thereafter, Forsyth County police officers obtained an arrest warrant for Jones. While searching Jones's vehicle and residence, the police discovered business cards in several of Jones's aliases and twenty-six checks totaling $67,005, and various other items.

While committing the instant offense, Jones also fraudulently leased a house in St. Marlo Golf and Country Club, Duluth, Georgia. Jones signed the lease in July 2004 and was evicted in September 2004. During that period, Jones attempted to pay the $9,300 in rent due with a series of three fraudulent checks with a total face value of $21,300. The landlord claimed a loss of $11,000 as a result of Jones's fraud.

On appeal, Jones argues that at sentencing the district court (1) erred by including in its fraud-loss calculation under U.S.S.G. § 2B1.1(b) the loss amounts associated with his fraudulent conduct prior to his incarceration in Virginia because those acts were distinct from the instant offense and too temporally remote; (2) erred by including both the $45,500 he used to fraudulently purchase the 1998 Range Rover as well as the $28,851 he later sold the vehicle for to Carmax; (3) erred by including in the total fraud-loss amount the cumulative face value of the fraudulent rent checks that Jones presented to his landlord rather than

3

the rent amount actually due; and (4) plainly erred by including in its fraud-loss calculation outdated checks seized from Jones's residence and vehicle.

## STANDARD OF REVIEW

The district court's application of the Sentencing Guidelines presents a mixed question of law and fact. *United States v. Anderson*, 326 F.3d 1319, 1326 (11th Cir. 2003). The Court reviews the findings of fact for clear error, and its application of the sentencing guidelines to those facts *de novo*. *Id.* The Court reviews a district court's findings of fact at sentencing regarding the amount of loss for clear error. *United States v. Manoocher Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001).

## DISCUSSION

1. Pre-Incarceration Conduct

Jones argues that the district court erred by including in its fraud-loss calculation the $160,476.80 loss associated with his fraudulent conduct that occurred before his Virginia incarceration. Jones contends that his pre-incarceration conduct cannot be considered relevant conduct under U.S.S.G. § 1B1.3(a)(2), because it did not involve a common scheme or plan and was not part of the same course of conduct.

Under the Guidelines, a district court may hold a defendant accountable "not

4

just for the 'offense of conviction,' but for all 'offense conduct,' which 'refers to the totality of the criminal transaction in which the defendant participated and which gave rise to his indictment, without regard to the particular crimes charged in the indictment.'" *United States v. Fuentes*, 107 F.3d 1515, 1522 (11th Cir. 1997) (quoting *United States v. Scroggins*, 880 F.2d 1204, 1209 n.12 (11th Cir. 1989)). Section 1B1.3(a)(2) of the Guidelines describes what "relevant conduct" must be considered in calculating a defendant's base offense level, and provides that the defendant must be held accountable for all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Maxwell*, 34 F.3d 1006, 1010 (11th Cir. 1994) (quoting U.S.S.G. § 1B1.3(a)(2)). Two offenses qualify as the "same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, comment. (n.9(B)). Relevant factors to consider include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* Two offenses qualify as a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.*, comment. (n.9(A)). Relevant conduct

5

may include uncharged conduct. *Maxwell*, 34 F.3d at 1010.

Jones argues that his pre-incarceration conduct (1) occurred between two-and-a-half and five-and-a-half years before the beginning of the charged check-kiting offenses, (2) involved the dissimilar scheme of acquiring vehicles and watches, and (3) involved a completely different type of victim and *modus operandi*. Jones argues that the government failed to demonstrate temporal proximity, similarity, or relevancy to the instant scheme.

At sentencing, the district court stated that Jones's ongoing fraudulent conduct was only interrupted by his term of incarceration; therefore, the pre-incarceration conduct could be considered relevant conduct under the Guidelines. This Court has not addressed whether an intervening term of incarceration will generally preclude a district court from finding that a defendant's pre-incarceration conduct was part of the same common scheme or part or the same course of conduct as the offenses of the conviction, because the pre-incarceration conduct is too temporally remote and did not occur with sufficient regularity. In this particular case, we find that the record demonstrates that Jones committed the extrinsic fraudulent conduct with sufficient regularity and in temporal proximity to the charged offense regardless of his incarceration.

Between May 1998 and April 2001, Jones engaged in a series of purchases

of six luxury vehicles and two Rolex watches using fraudulent certified checks. Jones ultimately was arrested in July 2001 in Virginia after attempting to sell one of the vehicles to an undercover officer. Jones remained incarcerated in Virginia until October 2003. The *same month* that he was released from incarceration, Jones immediately resumed his fraudulent activities, commencing the instant check-kiting offense. Given that there was no break in the activity outside of the period of incarceration, Jones's acts of creating and passing fraudulent certified checks represent an "ongoing series of offenses" within the meaning of § 1B1.3. U.S.S.G. § 1B1.3, comment. (n.9(B)).

Furthermore, the record demonstrates the Jones's pre-incarceration fraudulent conduct was sufficiently similar to the charged offense. In evaluating the "similarity, regularity, and temporal proximity" between the offense of conviction and the extrinsic conduct, this Court has cautioned that it would be improper to find two offenses sufficiently similar just because they are of the same general type. *See Maxwell*, 34 F.3d at 1011.

In *Maxwell*, this Court rejected the district court's conclusion that the defendant's distribution of dilaudid was part of the same course of conduct as his distribution of cocaine simply because both schemes involved "drug distribution." *Id.* at 1011. Unlike the situation in *Maxwell*, the district court in the case before

7

this Court did not conclude that the extrinsic acts and the instant offense were sufficiently similar solely because both offenses generally involved "fraud." *See id.* Rather, the facts of this case demonstrate an overlap in the *modus operandi* and similarity of Jones's pre- and post-incarceration conduct. The evidence shows that, in both instances, Jones's *modus operandi* was to create and use fraudulent certified checks to defraud his victims. While his pre-incarceration conduct involved a scheme to acquire and resell vehicles and jewelry, and his post-incarceration conduct involved check kiting between various financial institutions, the schemes were based on the same method and were sufficiently similar to allow for a finding that they were part of a common scheme or same course of conduct. In addition, the evidence shows that Jones also used the same alias, Jacques Deloach, during both periods. Furthermore, even after his incarceration, Jones engaged in the identical act of using a fraudulent certified check to purchase a vehicle.

Therefore, the district court did not clearly err in finding that Jones's pre- and post-incarceration conduct were sufficiently similar and amounted to relevant conduct under § 1B1.3, and that the pre-incarceration conduct could be considered in calculating the total loss amount under § 2B1.1(b).

2. Loss Calculation of the Range Rover

Jones argues that the district court erred by including in its loss calculation both the $45,500 fraudulent check he used to purchase the 1998 Range Rover as well as the $28,851 he received when he sold the vehicle to Carmax. Jones argues that the district court ignored the value of the car that he provided to Carmax, and the court should have given him an offset credit because he did not intend to cause a loss greater than $45,500. Jones contends that the loss amount should have been either $45,500 or $28,851, but not both amounts.

Section 2B1.1 of the United States Sentencing Guidelines provides a 14-level enhancement for a fraud offense involving between $400,000 and $1 million in loss. U.S.S.G. § 2B1.1(b)(1)(H) (2004). Application Note 3 to that section provides that the "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*., comment. (n.3(A)(i)). "'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id*., comment. (n.3(A)(ii)). The Guidelines also provide for "credits against loss," stating that the loss amount shall be reduced by either (1) the fair market value of any property returned to the victim before the offense was detected; or (2) "[i]n a case involving collateral pledged or

9

otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." *Id.*, comment. (n.3(E)(i)(ii)).

The district court did not clearly err in finding that Jones's initial fraudulent purchase, and then sale of the 1998 Range Rover were separate transactions designed to cause a loss to two distinct victims. The facts of this case demonstrate that Jones used a fraudulent cashier's check in the amount of $45,500 to purchase a 1998 Range Rover from a private seller. Jones then sold the 1998 Range Rover to Carmax for $28,851. At the time of each transaction, Jones intended to deprive the private seller of the $45,500 value of his vehicle, as well as to deprive Carmax out of $28,851.00 *See* U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)). Furthermore, Jones's claim that he was entitled to a "credit against loss" for the value of the vehicle is without merit. *Id.*, comment. (n.3(E)(i)(ii)). Jones neither returned the vehicle to the original owner before the offense was detected, nor pledged any collateral to protect either of the two victims. Accordingly, the district court did not err by including both the $45,500 and the $28,851 loss amounts in its fraud-loss calculation.

3.      Loss Calculation of Rent Checks

10

Jones argues that the district court erred by using the cumulative face value of the three fraudulent checks he passed to his landlord for payment of rent on his house in St. Marlo Golf and Country Club. Jones contends that the actual and intended losses were the same, because his second and third fraudulent checks were only presented to his landlord in order to remedy the problem with his first fraudulent check. Jones notes that his landlord only claimed a loss of $11,000, while the PSI calculated the loss value of $30,600.

Federal Rule of Criminal Procedure 52(a) states that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed.R.Crim.P. 52(a). At sentencing, the district court noted that based on the court's other rulings as to Jones's fraud-loss calculation, that Jones's amended total fraud-loss amount was $425,960. Thus, the $19,600 difference between the $30,600 figure used by the district court and the $11,000 in rent actually owed to Jones's landlord was insufficient to get Jones below the $400,000 threshold. U.S.S.G. § 2B1.1(b)(1)(H). Therefore, even if the district court erred by including the cumulative face value of each of Jones's fraudulent rent checks in its total fraud-loss calculation, Jones cannot demonstrate that the error affected the calculation of his sentence. *See* Fed.R.Crim.P. 52(a).

4.     Loss Calculation of Outdated Checks

Finally, Jones argues that the district court plainly erred by including in the loss calculation the value of outdated fraudulent checks seized from his vehicle and residence. Because Jones's challenge to the inclusion of these checks was not raised in the district court, we review for plain error. *United States v. Cover*, 199 F.3d 1270, 1274 (11th Cir. 2000). To satisfy the plain error standard, we must find that "(1) there was error in the district court's determination, (2) the error was plain or obvious, and (3) the error 'affected substantial rights' in that the error was prejudicial and not harmless." *United States v. Chisholm*, 73 F.3d 304, 307 (11th Cir. 1996).

Jones asserts that the seized checks bore dates as far back as June 2000, more than four years before his arrest in the instant case. Jones claims that all but nine of the twenty-six seized checks were dated more than ninety days before his September 3, 2004, arrest, and equated to $58,070 of the $67,005 total used by the district court. Jones contends that the relatively old age of those checks demonstrate that he lacked any intent to utter those checks; therefore, the checks should not have been included in the total fraud-loss calculation.

In its response, the government asserts that the relative age of the checks and the fact that the checks had not been presented for payment are inconsequential, because the key issue is Jones's intent to cause loss with the seized checks. The

government argues that Jones's intent to use counterfeit checks to defraud others is apparent from his actions in committing the instant offense.

Jones does not satisfy his burden under plain-error review. Jones cites no case law to support his assertion that the relative age of the checks evinces a lack of intent to negotiate the checks.

In a similar situation, this Court held that "when an individual possesses a stolen check, or a photocopy of a stolen check, for the purpose of counterfeiting, the district court does not clearly err when it uses the full face value of that stolen check in making a reasonable calculation of the intended loss," even when the copy of the check does not list an amount. *United States v. Grant*, 431 F.3d 760, 764-65 (11th Cir. 2005) (involving a scheme to use photocopied checks to create new fraudulent checks). In *Grant*, this Court stated that the defendant's intent is paramount, and that a district court is justified in including a check's full face value in the loss calculation where the evidence indicates the defendant intended to utilize the full face value of the check. *Id*. at 765.

In the case before this Court, the scope of Jones's fraudulent-check activities over the course of a number of years demonstrates that Jones had the intent to cause loss with the checks seized from his vehicle and residence, regardless of the dates listed on those checks. The Guidelines's definition of "intended loss"

13

includes "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)). Therefore, the district court did not plainly err by including in the total fraud-loss amount the value of the twenty-six checks seized from Jones's vehicle and residence. Accordingly, the district court did not err, and we affirm.

**AFFIRMED**.